IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| MISSOURIANS FOR FISCAL ACCOUNTABILITY, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>JAMES KLAHR, in his official capacity )<br>as Executive Director of the )<br>Missouri Ethics Commission, )<br>)<br>Defendants. ) | Case No. 14-4287-CV-C-ODS |

ORDER AND OPINION GRANTING PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING ORDER

I.  BACKGROUND

Plaintiff is a "political organization" within the meaning of section 527 of the Internal Revenue Code.  It was formed on October 22, 2014 with the intent of collecting contributions and expending money to advocate for Proposition 10, a proposed amendment to the Missouri Constitution that will be voted upon during the November 4, 2014 general election.  To that end, Plaintiff endeavored to register as a "campaign committee" as required by Missouri statutes.  However, Missouri statutes preclude Plaintiff from collecting or spending money to support Proposition 10 because it did not register as a campaign committee at least thirty days before the election.

Section 130.011 of the Revised Missouri Statutes defines a "campaign committee" in terms that include limitations on what a campaign committee is and can do.  In pertinent part, the statute provides as follows:

> a committee, other than a candidate committee, which shall be formed by an individual or group of individuals to receive contributions or make expenditures and whose sole purpose is to support or oppose the qualification and passage of one or more particular ballot measures in an election . . . shall be formed no later than thirty days prior to the election for which the committee receives contributions or makes expenditures . . . .

Section 130.011 thus creates a blackout period during which a campaign committee cannot collect or expend funds. This blackout period exists for the first thirty days of the campaign committee's existence.

On October 30, Plaintiff initiated this lawsuit alleging this restriction on its ability to collect and expend funds to support Proposition 10 violates the First Amendment and seeking an injunction to protect itself from the adverse effects of violating section 130.011. Shortly after 11:00 a.m. on October 31, Plaintiff filed a Motion for Temporary Restraining Order. The Court conducted a telephonic hearing at 3:30 p.m. that same day; both parties participated.

Any person who violates the provisions of Chapter 130 may be found guilty of a class A misdemeanor. Mo. Rev. Stat. § 130.081.1. However, Defendant is not empowered to prosecute criminal violations. Defendant James Klahr has been sued in his official capacity as Executive Director of the Missouri Ethics Commission ("the Commission"). During the hearing, Defendant's counsel conceded Defendant has the power to conduct investigations and assess fines against campaign committees that violate Missouri's election laws, including section 130.011.

## II. DISCUSSION

Whether a TRO should be issued "involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). The most important of these factors is the plaintiff's likelihood of success. E.g., S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir.), cert. denied, 506 U.S. 863 (1992). Consequently, the Court elects to consider that factor first.

A.  Likelihood of Success on the Merits

The First Amendment protects the right to participate in the political process, and this includes the right to participate in the political process by making political donations or spending money to express one's political views.  E.g., McCutcheon v. FEC, 134 S. Ct. 1434, 1441 (2014).  There are, however, a variety of governmental interests (of varying degrees of importance) that might justify limiting or regulating political contributions and expenditures.  The collision of these interests with the First Amendment has wrought a long line of Supreme Court decisions (starting, probably, with *Buckley v. Valeo*, 424 U.S. 1 (1976)) and corresponding reactions from Congress and state legislatures attempting to vindicate those interests within the confines of the First Amendment.  The time allotted does not permit the Court to fully explore the many relevant decisions (and nuances therein).  In crude summary, expenditure limits directly limit speech, and therefore are subject to exacting scrutiny.  A limit on expenditures to support or oppose a candidate or issue must promote a compelling governmental interest and be the least restrictive means of accomplishing that interest.  E.g., McCutcheon, 134 S. Ct. at 1444.  Limits on contributions receive a lesser, but still significant, degree of scrutiny.  Such limits are valid "if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms."  Id. (quotations omitted).

The Supreme Court has "identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption" and has "consistently rejected attempts to suppress campaign speech based on other legislative objectives. . . . The First Amendment prohibits . . . legislative attempts to fine-tune the electoral process, no matter how well intentioned."  McCutcheon, 134 S. Ct. at 1450 (quotation omitted).  Moreover, the legislature may target only one type of corruption: quid pro quo corruption.  Id.  There is no need to delve into the contours of what quid pro quo corruption is (or is not) for two reasons.  First, Defendant did not contend the blackout period created by section 130.011 is intended to prevent corruption of *any* kind.  Second, as a matter of logic it is difficult to apprehend any risk of

3

a quid pro quo corruption: while a candidate could theoretically promise "governmental rewards" in exchange for campaign contributions, a ballot issue cannot.

Instead, Defendant contends the blackout period promotes the State's interest in informing voters of the sources of election-related spending. This interest has been recognized as valid and has most often been posited as justifying disclosure requirements. In fact, this issue was addressed in Buckley. See Citizens United v. FEC, 558 U.S. 310, 367 (2010) (discussing Buckley). "Disclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities and do not prevent anyone from speaking. The Court has subjected these requirements to exacting scrutiny, which requires a substantial relation between the disclosure requirement and a 'sufficiently important' governmental interest." Id. at 366-67.

The difficulty is that the blackout period is not a disclosure requirement. It does not require those collecting or expending funds to say anything to anyone, much less to the electorate. To the contrary, the blackout period *forbids* communication by preventing the committee from expending solicited funds. Therefore, the cases upholding disclosure requirements provide little aid to Defendant's position.

Analyzed independently, the blackout period does not appear defensible as a means of promoting the State's interest in informing the voters. The primary reason has already been identified: section 130.011 does not tell voters anything. During the hearing, counsel for Defendant suggested that the blackout period accomplishes the State's objective by making sure a campaign committee is registered and existing for thirty days before it engages in political activity. However, knowing the mere fact that a campaign committee exists imparts no knowledge. Knowing a committee exists does not tell the electorate what issue or issues the committee is interested in, much less what position the committee plans to take. Consider the Plaintiff, and assume that it registered as a campaign committee on April 1, 2014. Further assume that it complied with the blackout period and did not collect or expend funds for the ensuing thirty days. At the end of the thirty days, what would the voters know? At best, they would know that an entity called Missourians for Fiscal Accountability was created on April 1. The voters would not know that the committee planned to collect and expend funds to take a

position with respect to Proposition 10, nor would they know that the committee planned to support its passage.  A committee could even comply with the statute by registering more than thirty days before the election, then wait until the days before the election to begin collecting and spending money; in such a case, the electorate would have just as much (or just as little) information as the electorate will have about Plaintiff.  The blackout period simply does not accomplish its objective as a voter education tool, and thus does not withstand exacting scrutiny.

If the State wants to educate the voters, it can employ more effective means that are less violative of First Amendment rights – that is, disclosure requirements.  Catholic Leadership Coal. of Texas v. Reisman, 764 F.3d 409, 428-29 (5th Cir. 2014); see also Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 298-99 (1981) ("The public interest allegedly advanced by [a contribution limitation] – identifying the sources of support for and opposition to ballot measures – is  insubstantial because voters may identify those sources under the provisions [establishing disclosure requirements].").  If Missouri does not have a disclosure requirement, then enforcing the blackout period does nothing to inform the voters.  If Missouri has a disclosure requirement, then the blackout period does nothing to further inform the voters.  For these reasons, the Court concludes Plaintiff is likely to prevail on its claim that section 130.011's blackout period violates its First Amendment rights.

## B.  Threat of Irreparable Harm

The threatened loss of First Amendment rights qualifies as an irreparable harm in its own right.  E.g., Child Evangelism Fellowship of MN v. Minneapolis Special Sch. Dist. No. 1, 690 F.3d 996, 1000 (8th Cir. 2012) (quoting Lowry ex rel. Crow v. Watson Chapel Sch. Dist., 540 F.3d 752, 762 (8th Cir. 2008)).  The circumstances of this case heighten the risk: delaying all relief until the conclusion of the case would preclude any possibility of Plaintiff exercising its First Amendment rights because the election will certainly be over before this litigation ends.

Defendant is sued in his official capacity as the Commission's Director;[1] while the Defendant cannot prosecute Plaintiff criminally for violating section 130.011, Defendant can initiate non-criminal proceedings that result in fines. The specter of financial penalties for engaging in First Amendment conduct – and the corresponding disincentive imposed for Plaintiff's exercise of its rights – is sufficient to qualify as irreparable harm.

Defendant argues there is no irreparable harm because Plaintiff waited until approximately two weeks before the election to try to comply with Missouri's law, and its late entry into the political fray (and the late filing of this suit) demonstrates disingenuousness. The Court shares these views; in fact, the Court expressed these views on the Record near the conclusion of the hearing. The Court believes Plaintiff has deliberately waited until the last possible moment before inundating the electorate with a series of political advertisements, lulling those on the other side of the issue into complacency – which does not serve the higher purpose of fairly and accurately debating issues or educating the voters. The Court also believes the eleventh-hour effort was designed to deprive Defendant of an opportunity to meaningfully defend the statute. However . . . regardless of the correctness of these views and regardless of the reason Plaintiff (1) did not exist until October 22, (2) waited to file this lawsuit until October 30, or (3) waited to ask for a temporary restraining order until October 31, Plaintiff still has First Amendment rights. It is not for Defendant or the undersigned to

---

[1]Defendant raised an issue as to whether suing Defendant alone could be construed as a suit against the entire Commission, or whether Plaintiff had to sue each of the Commission's members in their official capacity in order to sue the Commission as a whole. Neither side proffered a definitive answer to this question. The Court's independent and necessarily time-abbreviated review reveals that it is customary to sue each of the members of a commission or board in their official capacities when seeking to assert an *Ex Parte Young* style claim. Whether this is a requirement or merely custom is uncertain, although the Court is inclined to think it is the former.

Regardless, the Court intends to enter a TRO against the party named in the Complaint. Plaintiff will have to decide whether the TRO it sought is sufficient to provide the assurances it truly desires; similarly, the Commission will have to decide whether the TRO applies to it. Depending on these decisions, a definitive answer may never be necessary.

One thing is clear, however: Plaintiff has not sued anybody with authority to prosecute crimes. Therefore, this TRO has no effect on any state or local official empowered to bring criminal charges for violating section 130.011.

evaluate a speaker's motives for speaking or for choosing when he, she, or it wants to speak. The fact remains: regardless of when it came into existence or why it waited so long to speak, Plaintiff has the right to speak. And the threatened repercussions for exercising that right constitute a threat of irreparable harm.

### C. Balance of Interests

The Court's conclusion regarding this factor is largely foretold by the discussion to this point. Plaintiff has a First Amendment right to collect and expend funds so it can express its political views. The state's legitimate interest in informing the electorate as to the source of those funds is ill-served by enforcing the blackout period. Thus, the Court sees little threat of harm to legitimate interests by granting the TRO. While the TRO may not provide Plaintiff the succor it desires (see footnote 1, supra), it may. Moreover, the minimal State interest is easily outweighed by the importance in vindicating First Amendment interests to the extent Plaintiff seeks.

### D. Public Interest

The public interest was addressed in the preceding section because Defendant proffered the public's interest as his own. The Court's prior discussion applies here as well.

### E. Miscellaneous

Plaintiff's motion, and its Proposed Order, sought additional relief. To clarify matters, the Court is not granting this additional relief. This is a Temporary Restraining Order. It is not a final judgment. Therefore,
- The Court is not entering a preliminary injunction or a permanent injunction.
- The Court is not issuing a final declaration that the blackout period imposed by section 130.011 violates the First and Fourteenth Amendments.
- The Court is not awarding Plaintiff its attorney fees and costs.

However, the Court does hold that there is no need for Plaintiff to post a bond because there does not appear to be any risk of financial harm to Defendant.

### III.  CONCLUSION

The Motion for Temporary Restraining Order (Doc. # 5) is granted.  The Court temporarily enjoins Defendant James Klahr, acting in his official capacity as Executive Director of the Missouri Ethics Commission, from enforcing the thirty-day blackout period imposed by Section 130.011 of the Missouri Revised Statutes.  This means Plaintiff may take actions that violate the blackout period while this TRO is in effect and that Defendant may not investigate or sanction Plaintiff for taking those actions.
IT IS SO ORDERED.

DATE: November 2, 2014

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT